Wright, J.,
delivered the opinion of the Court.
This is a bill filed by the heirs and personal representatives of Wiley Blair, deceased. One of its objects is to charge James H. Johnston, Samuel M. Johnston, and Thomas H. Calloway* with the one-fifth of $17,438 47, with interest on the same, since 1853.
*14 On the 3d of May, 1851, Wiley Blair agreed to sell and convey to the said Samuel M. Johnston and Thomas H. Calloway, four-fifths of the tract of land upon which the town of Loudon is now situated, including the ferry at that place, reserving in himself the other one-fifth.
On the same day, the said Wiley Blair, Samuel M. Johnston, and Thomas H. Calloway, associated themselves together under the firm name of Samuel M. Johnston & Co. The object of this association, as is shown in the bill and the record elsewhere, was to lay the said tract of land off into town lots, streets, &c., and to sell the same on speculation, and divide the proceeds among the parties, according to their interest. In other words, to establish and promote the growth of said town, with a view of profit by the sale of the lots. That Wiley Blair was a member of this company, is shown in the articles of association and other evidence in the record, and is not here controverted. There was a stipulation, that other stockholders might be admitted as members of tlie company, and others were admitted.
On the 5th of July, 1852, the said Wiley Blair, Samuel M. Johnston, and Thomas H. Calloway, constituted James H. Johnston their attorney in fact, and general agent to sell and convey lots, collect the money, manage the ferry, receive tolls, &e. Under this power, he had in his hands a large amount of the funds of the company.
In 1853, in order to enhance the value of the lots, and promote their sale, it became necessary, in the judgment of the company, to 'establish a rolling mill in the town; and one George Welch, a manufacturer, was *15 invited to engage in the business. The company made him a donation of a lot, and agreed to, and did loan him the above named sum of $17,438 17, to enable him to purchase and bring on the necessary machinery. This loan was made by the company through their agent, James H. Johnston, out of the funds in his hands; and no security was taken because the company retained the legal title to the lot upon which the mills were to be erected, and it was deemed ample security. The money was invested in the machinery and the mills built; but from some cause the enterprize failed, and the company were compelled to take back the lot with the mills upon it. And it is alleged, and the fact probably is so, that a part of the debt will be lost.
The Chancellor refused, and we think very properly, to charge Samuel M. Johnston, Thomas H. Calloway, or James IT. Johnston, with this loss, and, correctly, held it should be borne by the company. It is not denied but that Samuel M. Johnston and Thomas H. Calloway, two of the members of the company, authorized the agent, James IT. Johnston, to make the loan. But it is said, that so far as Wiley Blair is concerned, it was made without authority, and in opposition to his will. It is admitted that it was made in good faith, and to advance the interest of the company. Upon the facts stated in this record, it is exceedingly plain that complainants are entitled to no relief. It may be conceded that the power of attorney to James II. Johnston gave him no authority to make the loan, (Story on Agency, § 62,) yet the association of Samuel M. Johntson & Co. was in fact and in law a joint stock company — a co-partnership — and Samuel M. Johnston and *16 Thomas H. Calloway bad authority to loan this money, and to bind the other members of the firm. Story on Agency, § 37. The loan was for the benefit of all, and in their common business; and to hold that the two members who made it, or the agent who acted under their instructions, must now make good the loss to the company, would be at war with every principle of the law of partnership.
But if this were not so, we think the proof in the record sufficiently establishes that Wiley Blair, in his lifetime, actually gave his assent to this loan, and never, in any way, complained of what had been done by his co-partners. It is true, we think, that he did not own stock in the mills, and it is likely that none of the firm' did; yet they were all interested in the success of the enterprize as partners. Blair lived in the town all the while until Welch failed, and the lot and mills had come back to the company, and yet remains wholly silent as to this transaction, large and important as it was to the interest of the firm. 2 Greenl. Ev. §§ 66 and 67.
It is said his mind was impaired by the excessive use of intoxicating liquors. This was no doubt so. But yet he is shown to have had prudence and caution in the management of his affairs, and, as we think, every way capable.
An attempt is made, in the record, to use Ms declarations to charge his co-partners with the loss, but these are inadmissible for any purpose.
There was no neglect, or want of care in the man agement "of this fund by any of the defendants. We affirm the decree.